UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| HIRSHON LAW GROUP PC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:23-cv-00445-LEW |
| ) | |
| WELLS FARGO BANK NATIONAL ) | |
| ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |

## ORDER ON MOTION TO DISMISS

Plaintiff Hirshon Law Group PC seeks to recover from Defendant Wells Fargo Bank National Association funds lost to a non-party fraudster. Defendant seeks the dismissal of Plaintiff's case on the ground that the causes of action Plaintiff asserts are incompatible with Article 4A of the Uniform Commercial Code ("UCC"). Mot. to Dismiss Am. Compl. (ECF No. 19); Mot. to Dismiss Second Am. Compl. (ECF No. 29). For reasons that follow, Defendant's Motions to Dismiss will be granted in limited part, as stated in the conclusion of this Order.

### BACKGROUND

The background statement is drawn from Plaintiff's Second Amended Complaint (ECF No. 28). The factual allegations are regarded as true for purposes of the Motions to Dismiss.

Plaintiff Hirshon Law Group PC is a single-attorney law firm. In August 2023, Plaintiff represented BE Holdings, LLC, in connection with a real estate purchase. By contract, the closing was required to take place on August 11, 2023. On August 9, 2023, to facilitate that transaction, Plaintiff requested, by email, that BE Holdings wire a sum of money to the "Hirshon Law Group, P.C. IOLTA" account at TD Bank and provided the wiring instructions. At the time, a third-party had hacked into and was monitoring Plaintiff's email account. This third-party will be named the "fraudster." Shortly after Plaintiff sent its message, the fraudster used Plaintiff's email account to send contradictory instructions to BE Holdings. Specifically, the fraudster wrote an email in Plaintiff's name and instructed BE Holdings to instead wire the funds to a different account, one the fraudster had with Defendant Wells Fargo in Texas. The fraudster indicated that the wire should identify the account holder as Hirshon Law Group, P.C. IOLTA, although Hirshon Law Group was not the account holder of record.

Believing the fraudster's email had come from Plaintiff, BE Holdings sent the fraudulent wiring instructions to its bank on August 9, 2023. Later that day, Defendant Wells Fargo accepted the fraudulent wire transfer into the fraudster's account. On August 10, Plaintiff discerned that the funds had not been sent to the escrow account at TD Bank and that the funds had been wired to Defendant's Texas bank. Plaintiff immediately notified Defendant of the fraudulent transaction. At or about 11:30 a.m. on August 10, 2023, Defendant acknowledged receipt of the notice of the fraudulent transaction and advised Plaintiff that it would respond in due course.

Prior to Defendant's acceptance of the fraudulent wire transfer, the balance in the fraudster's Texas account was eighty-seven cents ($0.87). On August 9, 2023, the fraudster drew two checks on his Texas account: one payable to the order of, presumably, himself and the other identifying the payee as "AEEA COMERCIO EXPORTACO LTD AI." That same day, the fraudster deposited the checks in two different banks.[1]

After Defendant was notified of the fraud and theft on August 10, 2023, it had at least until midnight of that day to make or decline final payment on the checks the fraudster drew from his account with Defendant. Knowing that the funds in the Texas account did not lawfully belong to the fraudster, Defendant nevertheless made or allowed payment of the checks, thereby substantially depleting the stolen funds in the account. Evidently, sometime thereafter Defendant placed a hold on the account because, on or about September 5, 2023, Defendant returned One Hundred Three Thousand Nine Hundred Eighty-five Dollars and Eighty-seven Cents ($103,985.87) to BE Holdings.

Plaintiff alleges that under the Uniform Commercial Code and/or the common law, Defendant owed BE Holdings and/or Plaintiff[2] a duty of care and/or fiduciary duties to manage and safeguard the stolen funds once Defendant was placed on notice of the circumstances, but breached it duties by funding the fraudster's checks. Plaintiff's Second Amended Complaint does not itemize separate counts, but rather identifies the UCC and common law duties as the bases for the action, including fiduciary duties, the duty to

---

[1] Combined, the value of the two checks exceeds the threshold for diversity jurisdiction.

[2] Plaintiff proceeds in this matter as a subrogee of the rights of BE Holdings, based on Plaintiff's indemnification of BE Holdings' loss of funds to the fraudster.

3

observe the standard of reasonable care, and the duty to observe good faith and fair dealing in commercial transactions.

## DISCUSSION

For Plaintiff to overcome Defendant's Motion to Dismiss, Plaintiff must plead "a short and plain statement" of each claim that shows it is "entitled to relief." Fed. R. Civ. P. 8(a)(2). This requires "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausible "means something more than merely possible," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), but is "not akin to a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Through its Motions to Dismiss, Defendant argues that Plaintiff has failed to state any claim for which relief may be granted because a bank never owes a common law duty to a non-customer; even if that is not so, there is, in any event, no fiduciary relationship; the UCC preempts any common law claim; a Maine statute expressly bars any such claim; and there is no underlying UCC claim. I address these contentions (out of order) below, but first observe that I am not convinced that a common law duty cannot arise in this scenario. It is conceivable that, with sufficient notice, a bailment or duty of reasonable care might arise. As explained below, this involves a question of Texas law. Pursuant to *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), I must predict how a state court in Texas would determine the existence of a duty, a challenge neither party has prepared me to address at this juncture and one that I will reserve for another occasion, unless Defendant persuades me that there is no need to reach it.

4

A.      **Maine Law Governing Deposits in Financial Institutions**

Defendant asserts that, under Maine law, banks are shielded against precisely this kind of claim, citing 9-B M.R.S. § 427(10).  Pursuant to the cited statute, except for certain exceptions that do not apply here, the mere provision of "notice to a financial institution [of] an adverse claim to a deposit or account standing on its books to the credit of any person is not effectual to cause that institution to recognize the adverse claimant."  *Id.*  Instead, the adverse claimant must execute a bond to indemnify the financial institution or else "procure[] a restraining order, injunction or other appropriate process against the institution from a court of competent jurisdiction in a civil action to which the person to whose credit the deposit or account stands is made a party."  *Id.*

Assuming that Maine law governs this dispute, the legislation would appear to sound the death knell for Plaintiff's claim.  The only other state that would reasonably supply the rule for decision would be Texas, which evidently does not have a similar statute, and where the funds were (at least conceptually) deposited and drawn away, to Plaintiff's resulting harm.  I therefore turn to choice-of-law principles to evaluate whether Maine law or Texas law governs this dispute over the disposition of funds in a Texas bank account.[3]  A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which it sits.  *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 41 (1st Cir. 2020).  Maine follows the approach of the Second Restatement of Conflict of Laws, under

---

[3] Defendant also suggests that the law of South Dakota and/or California might govern since those states are Defendant's primary bases of operation.  I cannot see why either state would supply the rules of decision for this controversy, as opposed to either Maine or Texas.

which a tort action generally will be decided under "the local law of the state where the injury occurred . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties." *State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 22, 995 A.2d 651 (quoting Restatement (Second) Conflict of Laws § 146).[4]  The "General Principal" of the Restatement is that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Restatement (Second) Conflicts of Laws § 145(1).  The principles set forth in section 6 specify that a court will follow the choice of law dictates of its state and otherwise will consider:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

*Id.* § 6.  Other considerations that might point in a different direction are where the injury-causing conduct occurred, where the parties call home, and where the parties formed their

---

[4] Section 146 of the Restatement concerns personal injury torts, so it is not on point here.

relationship. Restatement (Second) Conflicts of Laws § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* § 145. In cases where the location of the injury is fortuitous, "the place where the conduct occurred will be given particular weight in determining the applicable law." *Id.*, Comment (e).

Based on these several considerations, Texas bears the most direct relationship to the controversy over Defendant's alleged mishandling of funds deposited in an account at its Texas bank branch. This case entails a fortuity since the fraudster might well have had his bank account anywhere. Still, despite the fortuity, the location of the injury, the alleged dereliction of duty, and the formation of the legal controversy between Plaintiff and Defendant all coalesce in Texas. The claim does not concern the movement of funds from Maine to Texas, but rather the disposition of funds after their deposit in Texas. The alleged conduct involved Defendant's failure to dishonor checks drawn on a Texas account in its Texas branch. In this context, the state in which Defendant would have needed to act to fulfill its alleged duty was Texas. Even if bank personnel in South Dakota or California were tasked with deciding whether to act or what to do, the place where their decisions would produce action was Texas, where, presumably, the fraudster's checks would have been dishonored. Defendant clearly did not act in Maine and has no relationship with Plaintiff centered in Maine.

Furthermore, in terms of the general principals identified in the Restatement, in particular the needs of the interstate system, protection of justified expectations, policies underlying the particular field of law (banking), certainty and predictability, and ease of

determination, all favor Texas. Defendant maintains branches in Texas and its response to a notice of a fraudulent deposit in a Texas bank account ought to be governed by Texas law rather than by the fortuity of the defrauded party's domicile, particularly as Defendant would need to make informed judgments based on the law of the state in which the bank and account are located. And while the defrauded party felt its injury in Maine, Defendant's prior lawful acceptance of the funds into the Texas account meant that the defrauded party already was effectively dispossessed of its funds by operation of law when its claim arose. The location of the resulting controversy over the subsequent dissipation of the funds should correspond with the location of the funds, meaning Texas law rather than Maine law should govern this dispute.

Compared with these several reasons to apply Texas law, Plaintiff's mere presence in Maine and Defendant's mere presence in California and/or South Dakota do not justify the application of Maine, California, or South Dakota law. The application of Texas law is also consistent with the UCC choice-of-law dictates concerning "the rights and obligations between the sender of a payment order and the receiving bank," which rights and obligations "are governed by the law of the jurisdiction in which the receiving bank is located." 11 M.R.S. § 4-1507(1)(a).

For these reasons, dismissal based on 9-B M.R.S. § 427(10) is not warranted. Texas law governs this dispute.

**B.      Common Law Claims and UCC Preemption or Displacement**

Defendant argues that Plaintiff's common law claims are preempted by the Uniform Commercial Code ("UCC"). According to Defendant, "no UCC provision requires a wire

8

beneficiary's bank to safeguard funds for the benefit of an allegedly defrauded wire originator." Mot. to Dismiss Second Am. Compl. at 6. Defendant further asserts that the only way a defrauded originator of a wire transfer can prevent the loss of funds accepted by a receiving bank is to obtain a judicial order to that effect, *id.* (citing UCC § 4A-503), and that a receiving bank may disregard any claim of fraud communicated by the originator of a transfer, at least so long as there is no privity between the receiving bank and the originator of the wire transfer.[5]

Ultimately, I find Defendant's contentions unpersuasive. To the extent that Defendant relies on UCC § 4A-503 to assert that the only recourse for Plaintiff permitted by the UCC was to obtain injunctive relief in court, the provision states only that "[f]or proper cause and in compliance with applicable law, a court may restrain" payment orders, execution of payment orders, and the release or withdrawal of funds. Tex. Bus. & Com. Code Ann. § 4A.503. This is a far cry from a statutory requirement that a defrauded person obtain a court order as the exclusive means of preserving funds of which they have been dispossessed by means of fraudulent wire activity. Reliance on the courts as the exclusive authority to undo fraudulent wires is inconsistent with the ways courts, wire fraudsters, and banks work. For instance, it would be a rare circumstance in which a defrauded party would be able to draft a pleading or effectuate service on a bank (let alone a fraudster) in time to prevent the kind of theft that occurred in this case. Section 503 of Article 4a is

---

[5] Notwithstanding these legal assertions, Wells Fargo returned some of the stolen funds and evidently did so in the absence of a court order and despite a lack of privity. Wells Fargo does not explain why it was appropriate for it to do so and yet inappropriate for it to act more expeditiously upon its first receipt of the notice of the fraud.

better understood to simply recognize the power of courts to act as arbiters of disputes involving payment orders and related funds. Furthermore, by placing a hold on disputed funds pending an investigation a bank would not be usurping the judicial role, contrary to Defendant's suggestion.

As for the remaining assertion that Article 4a is the be all, end all of this dispute, I conclude otherwise principally because the controversy in this case concerns post-acceptance oversight of funds on deposit, rather than any claim of improper acceptance or deposit. As alleged, Plaintiff promptly notified Defendant of the fraud and Defendant had at its disposal the means of corroborating Plaintiff's contention, since the beneficiary identified in the wire transfer order, Hirshon Law Group PC IOLTA, was not the account holder associated with the Wells Fargo account number. The parties have agreed that, pursuant to UCC Article 4a, there was nothing improper in Defendant's acceptance of the payment order from BE Holdings to the Texas account based on the account number stated in the payment order. *See* Tex. Bus. & Com. Code Ann. § 4A.207 (concerning misdescription of beneficiary and providing rules to govern acceptance of a wire order). But what is not clear at this point is whether Article 4a or another UCC Article has anything to say about bank conduct post-acceptance, when the bank obtains knowledge that it has accepted an order for payment to an account, the account holder is not the intended beneficiary of the payment order, and the funds are still present in the account. If, as Defendant asserts, no UCC provision imposes any requirements on the bank or otherwise

speaks to the issue of safeguarding funds that the bank has cause to believe were misdirected, then it should not follow that the UCC preempts any common law remedy.[6]

UCC Article 4a commentary states that Article 4a is "the exclusive means of determining the rights, duties, and liabilities" of parties to a wire transfer, and that Article 4a is exclusive "in any situation covered by particular provisions of the Article." 11 M.R.S. § 4-1102 Official Comment. It also states, however, that it is not improper to "resort to principles of law or equity" when doing so would not "create rights, duties and liabilities" inconsistent with those stated in Article 4a. *Id.*; *see also Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197, 215-16 (1st Cir. 2012) ("[C]ourts have held that plaintiffs may turn to common law remedies to seek redress for an alleged harm arising from a funds transfer where Article 4A does not protect against the underlying injury or misconduct alleged.").

I am not persuaded that UCC Article 4a addresses the current controversy over the post-acceptance honoring of checks drawn on an account funded almost entirely with stolen funds, simply because the bank properly accepted and paid the funds into the account under the auspices of Article 4a. *See, e.g., Approved Mortgage Corp. v. Truist Bank*, 106

---

[6] Article 4a provides that the originator of a payment order has the right to recover from the person into whose account the funds were paid, "to the extent allowed by the law governing mistake and restitution." 11 M.R.S. § 4-1207(d); Tex. Bus. & Com. Code Ann. § 4A.207(d). In other words, Article 4a does not supply a right to recover from the beneficiary's bank where Article 4a permitted the beneficiary's bank to identify the beneficiary and accept the payment order based on the account number alone. The resulting dispute over possession of the funds would be between the beneficiary and the originator of the payment order. It is for this reason that Plaintiff does not contend that it has the right to recover from Defendant based on Defendant's acceptance of the payment order. Plaintiff asserts instead that its claim arises from Defendant's failure to promptly secure Plaintiff's funds once Plaintiff supplied information from which it was easy to ascertain that the payment was fraudulent or erroneous.

F.4th 582, 585 (7th Cir. 2024) (affirming dismissal of UCC claim based on UCC § 207, but vacating dismissal of common law claim because it was not preempted by the UCC); *Harris v. Garza*, No. 7:22-cv-00118, 2024 WL 4101920, at *1 (S.D. Tex. Aug. 8, 2024) (denying summary judgment based on evidence of bank's knowledge of suspicion nature of a transaction); *Schlegel v. Bank of Am., N.A.*, 628 S.E.2d 362, 368 (Va. 2006) (rejecting UCC preemption for claim based on bank's failure to return misappropriated funds).[7]

Defendant separately argues that UCC Articles 3 and/or 4 displace common law claims that concern a bank's decision to honor checks drawn by a fraudster against his account. Mot. to Dismiss Second Am. Compl. at 8. However, in this regard Defendant has not cited any particular provision that would govern the scenario described in the Second Amended Complaint. I do not consider this argument to be fully enough formed to merit a ruling at this time.

For these reasons, to the extent Defendant seeks the dismissal of Plaintiff's common law bases for relief on the ground that the UCC preempts or displaces them, the Motion is denied and the issue can be revisited at a later time with the benefit of a more probing analysis of Texas law and a developed record.

---

[7] Defendant cites *Valley Chili Properties, LLC v. Truist Bank*, 705 F. Supp. 3d 768, 770 (W.D. Tex. 2023), to contrary effect. There, the district court dissolved a TRO based on a finding that UCC Article 4a provides "a detailed system for recovering money that was wired to an unintended beneficiary." *Id.* at 773. The court read the Article's rules for how a wire transfer concludes (acceptance versus non-acceptance of a wire transfer order based on a misdescribed beneficiary with a process for unwinding some such transfers) as, essentially, a bar against any and all imposition of post-acceptance obligations on the receiving bank, even when a fraud is established and funds remain on account to be recovered. Because the court did not rest its decision on binding precedent issued by a Texas appeals court or the Fifth Circuit, it is itself persuasive rather than binding authority.

## C. Fiduciary Status

As a fallback to its UCC preemption argument, Defendant argues that it cannot be held liable as a fiduciary because it did not assume a fiduciary relationship with BE Holdings. In response, Plaintiff says that Defendant "became the trustee" once it received notice of an allegedly fraudulent wire transfer. Pl.'s Second Obj. at 14 (ECF No. 30).

Defendant's position that it cannot be forced into a fiduciary position with a non-client depositor of funds is intuitively reasonable. All that Plaintiff has offered in opposition is a citation to a Nineteenth Century decision of the New York Supreme Court, which is not binding in the context of this case. In the absence of a citation to Texas authority imposing on a bank not merely a duty of reasonable care but a fiduciary role in regard to a non-client whose money has been misdirected to it through no fault of its own, the claim for breach of a fiduciary duty will be dismissed. The baseline legal relationship between BE Holdings as depositor and Wells Fargo as bank would be one of creditor and debtor, which ordinarily would not suffice to generate fiduciary obligations under Texas law. *Citizens Nat'l Bank of Dallas v. Hill*, 505 S.W.2d 246, 248 (Tex. 1974); *Hudnall v. Tyler Bank & Tr. Co.*, 458 S.W.2d 183, 186 (Tex. 1970); *K3C Inc. v. Bank of Am., N.A.*, 204 Fed. App'x 455, 460-61 (5th Cir. 2006).

## D. The UCC Claim

As for the UCC claim, to the extent Plaintiff maintains that Defendant owed it post-acceptance duties under the UCC it is inapt that Plaintiff does not identify a provision of

13

the UCC that so states.[8]  It is Plaintiff's responsibility to state the basis for its UCC claim more specifically than by means of a global reference to the entire UCC.  Furthermore, Plaintiff must assert the UCC claim as a claim based on state law, presumably Texas law.  See Pl.'s Second Obj. at 9-13.[9]  Plaintiff has not done so and the claim as currently stated will therefore be dismissed for failure to state a claim.

## Conclusion

For the foregoing reasons, Defendant's Motions to Dismiss (ECF Nos. 19/29) are **GRANTED IN PART** and **DENIED IN PART**.[10]  Plaintiff has failed to state a claim for relief based on Defendant's alleged breach of fiduciary duties or the positive provisions of the UCC and those components of the Amended Complaint's claims are DISMISSED.  The case will proceed on Plaintiff's claims against Defendant for breach of its common law duties other than fiduciary duties.  The order of dismissal is without prejudice to Plaintiff's ability to amend its pleading within the deadline for amendment of the pleadings, which deadline is yet to be established in the Court's scheduling order.

---

[8] Plaintiff evidently means to cite 11 M.R.S. § 4-104(1)(j) and its Official Comment 10 concerning the term "settlement," which may be provisional rather than final.  Plaintiff also cites 11 M.R.S. § 4-301(a), evidently to demonstrate that Defendant had the discretion to dishonor the checks the fraudster drew from his account with Defendant.  *See* Second Obj. at 3 n.1.  These provisions do not assign liability or discuss the consequences of a lack of due care concerning the exercise of the discretion to dishonor checks.

[9] Plaintiff claims that it should be considered to have the status of Defendant's "customer" under the UCC.  Pl.'s Second Obj. at 13-14.  However, even assuming that this is a correct assertion, being a customer is not the same thing as having a cause of action authorized by the UCC.

[10] Although it is common for a court to dismiss as moot an initial motion to dismiss following the Court's acceptance of a motion to amend, here the pre-amendment and post-amendment motions are predominantly duplicative such that the ruling impacts both motions to like effect.

**SO ORDERED.**

Dated this 26th day of September, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge